| | |
|---|---|
| CALVIN LEWIS | CIVIL ACTION |
| VERSUS | NO. 18-4776 |
| RANDY SMITH, *individually and in his capacity as Sheriff of St. Tammany Parish* | SECTION M (4) |

## ORDER & REASONS

Before the Court is a motion to dismiss filed by defendant Sheriff Randy Smith, individually and in his capacity as Sheriff of St. Tammany Parish ("Sheriff Smith"),[1] to which plaintiff Calvin Lewis ("Lewis") responds in opposition.[2]  Having considered the parties' memoranda and the applicable law, the Court issues this Order & Reasons.

## I.      BACKGROUND

This case concerns alleged violations of constitutional rights.  Lewis is a former employee of the St. Tammany Parish Sheriff's Office ("STPSO").[3]  In 1997, the STPSO hired Lewis as a reserve deputy.[4]  Lewis was promoted several times over the years and obtained the rank of captain in 2016.[5]  In 2007, Lewis met Jane Doe ("Doe")[6] while he was assigned to a work detail, and began a relationship with her.[7]  Doe has a prior felony conviction.[8]  In 2010, Lewis and Doe, along with Doe's two children who were then-ages two and five, began living together.[9]  Lewis alleges that he, Doe, and the children continue to live together today.[10]

---

[1] R. Doc. 6.
[2] R. Doc. 8.
[3] R. Doc. 1 at 2.
[4] *Id.*
[5] *Id.* at 3.
[6] Lewis refers to the woman at issue as "Jane Doe" to protect her privacy, but says her identity is known to Sheriff Smith.
[7] R. Doc. 1 at 3.
[8] *Id.* at 4.
[9] *Id.* at 3.
[10] *Id.*

In January 2017, Lewis learned of a Facebook post in which an unnamed individual commented that "a newly promoted captain" was living with a convicted felon.[11]   Lewis informed Smith of the post.[12]   Then in May 2017, Lance Vitter, Arthur Meyers, and Major Richard Palmisano of the STPSO internal affairs department called Lewis in to discuss the fact that he was living with Doe, a convicted felon, in violation of the STPSO's anti-fraternization policy.[13]   The STPSO terminated Lewis's employment on May 19, 2017.[14]

On May 9, 2018, Lewis filed this action against Sheriff Smith, in his official and individual capacities, alleging that he was terminated pursuant to the STPSO's anti-fraternization policy, which Lewis urges is unconstitutional and selectively applied.[15]   The STPSO's anti-fraternization policy prohibits "fraternization" delineated, in pertinent part, as:

> Romantic or intimate personal or other close relationships between an employee and a known felon, Transitional Work Program inmate, or any incarcerated individual.
>
>       *       *       *
>
> Fraternization is also the undertaking of a personal relationship or association, with or without a sexual relationship, by a Deputy with a known felon, Work Release person, or any incarcerated individual(s) without the express written permission of the Sheriff, or his designee.   This includes any person held in custodial confinement by arrest or imprisonment.[16]

Lewis brings claims against Sheriff Smith, in his official and individual capacities, under 42 U.S.C. § 1983 alleging that this policy violates the First, Fifth, and Fourteenth Amendments to the United States Constitution by infringing upon and burdening the right of individuals to enter into and maintain intimate relationships.[17]   Lewis contends that strict scrutiny applies to evaluate

---

[11] *Id.*
[12] *Id.*
[13] *Id.* at 4.
[14] *Id.*
[15] *Id.*
[16] *Id.* at 5-6.   The document containing the policy is not attached to the complaint, so these provisions entitled "Fraternization" and "Improper Relationships Between Deputies and Incarcerated Individuals," respectively, appear here as quoted in the complaint.
[17] *Id.* at 4-5.

the constitutionality of the policy because "of the close and intimate nature of" his relationship with Doe.[18]

Lewis also alleges that the anti-fraternization policy is unconstitutionally overbroad and vague in violation of the Due Process Clause of the Fourteenth Amendment.[19] Lewis claims that the policy does not specifically or adequately define the terms "personal relationship," "close relationship," "association," "known felon," "work release person," "incarcerated individual," or "any person held in custodial confinement by arrest or imprisonment," therefore likely bringing unintended persons and relationships within the scope of the policy unbeknownst to the deputies.[20] Moreover, Lewis contends that the policy is vague because it does not provide guidelines for granting exceptions, nor does it contain a *mens rea* requirement meaning that a deputy can violate the policy without intentionally engaging in one of the prohibited relationships.[21]

Finally, Lewis alleges that Sheriff Smith selectively enforces the anti-fraternization policy in violation of the equal protection component of the Due Process Clause of the Fifth Amendment.[22] Lewis alleges that there are "several other" STPSO employees who are engaged in relationships or associations that violate the policy, including Sheriff Smith, who have not been disciplined or terminated.[23] Further, Lewis contends that the policy was arbitrarily enforced against him because he is African American.[24] Lewis seeks damages, including interest and attorney's fees.[25]

---

[18] *Id.* at 6-7.
[19] *Id.* at 7.
[20] *Id.* at 8.
[21] *Id.* at 8-9.
[22] *Id.* at 9.
[23] *Id.* at 9-10.
[24] *Id.* at 10.
[25] *Id.*

Sheriff Smith filed the instant motion to dismiss arguing that Lewis has not stated any viable claims for relief and that he is entitled to qualified immunity for Lewis's claims against him in his personal capacity.[26]  Lewis opposes the motion.[27]

## III.    LAW & ANALYSIS

### A.  Rule 12(b)(6) of the Federal Rules of Civil Procedure

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The statement of the claim must "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A pleading does not comply with Rule 8 if it offers "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555-57).

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move to dismiss for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible on the face of the complaint "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).   Plausibility does not equate to probability, but rather "it asks for more than a sheer possibility that a defendant has

---

[26] R. Doc. 6.
[27] R. Doc. 8.

acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Thus, if the facts pleaded in the complaint "do not permit the court to infer more than a mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court employs the two-pronged approach utilized in *Twombly*. The court "can choose to begin by identifying pleadings that, because they are no more than conclusions [unsupported by factual allegations], are not entitled to the assumption of truth." *Id.* However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* Motions to dismiss are disfavored and rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

A court's review of a Rule 12(b)(6) motion to dismiss "is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)). A court may also take judicial notice of certain matters, including public records and government websites. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2007); *see also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005). Thus, in weighing a Rule 12(b)(6) motion, district courts primarily look to the allegations found in the complaint, but courts may also consider "documents incorporated into the complaint by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the

complaint whose authenticity is unquestioned." *Meyers v. Textron, Inc.*, 540 F. App'x 408, 409 (5th Cir. 2013) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

## B. Section 1983 Claims

Section 1983 provides a remedy against "every person," who under color of state law, deprives another of any rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The statute is not itself a source of substantive rights; it merely provides a method for vindicating federal rights conferred elsewhere. *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 n.3 (5th Cir. 1999). To pursue a claim under § 1983, a plaintiff must: (1) allege a violation of rights secured by the Constitution or laws of the United States; and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Sw. Bell Tel., LP v. City of Hous.*, 529 F.3d 257, 260 (5th Cir. 2008); *see also West v. Atkins*, 487 U.S. 42, 50 (1988). Section 1983 claims can be brought against a person in his individual or official capacity. *Hafer v. Melo*, 502 U.S. 21, 23 (1991).

For Sheriff Smith to be liable in either his individual or official capacity, Lewis must first allege constitutional violations. Lewis's complaint purports to allege violations of the First, Fifth, and Fourteenth Amendments related to rights of association, due process, and equal protection.

### 1. Right of Association Under the First and Fourteenth Amendments

As explained by the Fifth Circuit in *Walker v. Henderson*, 239 F.3d 366 (5th Cir. 2000):

The seminal Supreme Court decision addressing the constitutional right of intimate association is *Roberts v. U.S. Jaycees,* 468 U.S. 609 (1984). In *Jaycees,* the Court reasoned that its decisions "have referred to constitutionally protected 'freedom of association' in two distinct senses." *Id.* at 617. One set of decisions concludes that "choices to enter into and maintain certain *intimate human relationships* must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to

6

our constitutional scheme."[28] *Id.* (emphasis added). The other line of cases recognizes "a right to associate for the purpose of engaging in those activities protected by the First Amendment ...."[29] *Id.* at 618.

Freedom of association in the former sense has historically been couched in terms of family. Marriage, childbirth, raising and educating children, and cohabitation with one's relatives are all intimate associations that the Court has very willingly recognized as worthy of constitutional protection. *Id.* (citations omitted). From the nature of these family relationships, the Court gleaned its basis for determining when other relationships may warrant treatment as constitutionally protected intimate associations.

Initially the inquiry must focus on whether by its nature the relationship at issue involves "deep attachments and commitments to necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Id.* at 620. Several factors elucidate the types of attachments and commitments that the Court would consider constitutionally protected intimate associations. They include "such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.*

These guideposts establish certain general parameters. As such, the Constitution imposes constraints on the State's power to control the selection of one's spouse that would be inapplicable to regulations affecting one's choice of fellow employees. *Id.* "Between these poles ... lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular [State] incursions ...." *Id.* Accordingly, determining which intimate associations merit constitutional limits on State intrusion "entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments."[1] *Id.*

Following *Jaycees,* the Court again addressed the right of intimate association stating that "freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill o[f] Rights." *Board of Dir. of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 545 (1987). Recognizing that such relationships take various forms, the Court stated that it had not "attempted to mark the precise boundaries of this type of constitutional protection." *Id.* Moreover, the Court unambiguously reasoned that

---

[28] "While the circuits agree upon the scope of its protection, some circuits have determined that the right of 'intimate association' derives not from the First Amendment, but from the substantive due process principles of the Fourteenth Amendment." *Fioretti v. City of Holly Springs*, 1997 WL 170319, at *4 n.3 (N.D. Miss. Mar. 31, 1997) (citing *Griffin v. Strong,* 983 F.2d 1544, 1546-47 (10th Cir. 1993); *Swank v. Smart,* 898 F.2d 1247, 1251-52 (7th Cir. 1990); *IDK Inc. v. County of Clark,* 836 F.2d 1185, 1191-92 (9th Cir. 1988)).

[29] Lewis's claims clearly involve intimate human relationships, not the activities expressly protected by the First Amendment, such as freedom of expression and religion. Thus, the Court does not analyze Lewis's complaint for claims of expressive association.

such protection is not restricted to relationships among family members. *See id.* The Court later qualified this view, however, expressing doubt that the "Constitution recognizes a generalized right of 'social association.'" *City of Dallas v. Stanglin,* 490 U.S. 19, 25 (1989).

Courts in this circuit have asserted that whether the intimate association right includes relationships beyond the familial context depends upon the extent to which the persons share qualities distinctive to family relationships. *Tillman v. City of West Point,* 953 F.Supp. 145, 151 (N.D. Miss. 1996) (citing *Louisiana Debating & Literary Ass'n v. City of New Orleans,* 42 F.3d 1483, 1494 (5th Cir.1995)). This rationale is consistent with the *Jaycees'* factors analysis and underscores the inappropriateness of using "bright line determination[s] of familial relationships" to establish the constitutional right of intimate association. *Tillman,* 953 F. Supp. at 150. Nonetheless, basing the intimate association analysis on "qualities distinctive to family relationships" can be challenging because "the definitional boundaries that limit the types of associations that constitute 'family relationships' are blurred." *Kipps v. Caillier,* 205 F.3d 203, 206 (5th Cir.2000).

[1] The framework *Jaycees* articulated to determine whether a particular relationship rises to the level of a constitutionally protected intimate association sparked some criticism. One such commentator found the framework problematic not only because it "fail[ed] to make the necessary connection between familial and nonfamilial relations[,]" but also because the Court gave no instruction regarding the relative importance of any factor. It also did not detail the fine contours of the right to intimate association. Neal E. Devins, *The Trouble With Jaycees,* 34 Cath. U.L. Rev. 901, 910 (1985) (noting that the highly unstructured framework of *Jaycees* necessitates ad hoc determination of which associations warrant constitutional protection).

*Walker v. Henderson*, 239 F.3d 366, at *2-3 (holding that plaintiff failed to allege sufficient facts demonstrating a protected intimate association "with her family and friends" during the relevant period) (parallel citations omitted).

Lewis' complaint alleges that the STPSO's anti-fraternization policy infringed on his right to enter into a relationship with Doe that is arguably protected by the right of association. Although Lewis and Doe are not married, Lewis alleges that they have cohabited for more than eight years and he is involved in raising her children. This relationship may fall on the continuum of protected relationships. While the jurisprudence does not define the precise contours of what relationships outside of marriage are protected, the Fifth Circuit has observed that relationships involving "deep attachments and commitments to necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and

8

beliefs but also distinctively personal aspects of one's life" are protected. *Walker*, 239 F.3d at *2-3. The question becomes, then, whether the intimate relationship at issue falls within the protection outlined at a rather high level of generality in cases like the Supreme Court's decision in *Roberts* and the Fifth Circuit's decision in *Walker*. Courts have struggled to apply this general guidance to the factual circumstances surrounding the relationships at issue in the cases before them. *Compare Isenbart v. Bd. of Cty. Comm'rs of Kit Carson Cty.*, 2012 WL 4378269 (D. Colo. Sept. 25, 2012) (finding constitutionally protected intimate relationship between state employee and sheriff who "moved in together" with intention "to create a familial relationship"), *with Stevens v. Holder*, 966 F. Supp. 2d 622 (E.D. Va. 2013) (finding no constitutional protection for non-marital, non-familial, romantic relationship between FBI trainees who were divorcing their spouses; observing "that *Isenbart* distinguishes between marital relationships and those merely involving romantic association or cohabitation outside of marriage"), *with Plummer v. Town of Somerset*, 601 F. Supp. 2d 358, 366 (D. Mass. 2009) (refusing to extend constitutional protection to right to intimate association outside bounds of marriage or civil union). Lewis cites no case directly on point holding that the kind of relationship he has with Doe undoubtedly falls within the ambit of a protected right of association.[30] However, Sheriff Smith does not dispute that Lewis' relationship with Doe is constitutionally protected. Under these circumstances, the Court declines to hold otherwise. But this does not end the inquiry into whether Lewis has stated a claim for violation of his First Amendment right of association.

Lewis argues that strict scrutiny applies to evaluate the constitutionality of the STPSO's anti-fraternization policy,[31] while Sheriff Smith argues that rational basis review is required.[32] Courts employ a two-step analysis to determine the appropriate level of scrutiny to apply to

---

[30] In fact, Lewis concedes that "the Fifth Circuit does not appear to have definitively ruled on the issue." R. Doc. 8 at 15.
[31] R. Doc. 8 at 7-10.
[32] R. Doc. 6-2 at 7.

governmental action that allegedly infringes on the right of marriage. *Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996). Although Lewis and Doe are not married, the Court finds it is appropriate to utilize the same approach because of the alleged marriage-like status of their relationship. First, courts "ask whether the policy or action is a direct or substantial interference with the right of marriage; second, if the policy or action is a direct and substantial interference with the right of marriage, apply strict scrutiny, otherwise apply rational basis scrutiny." *Id.* The court in *Montgomery v. Carr* cited two examples of "direct and substantial" interference with the right to marry – namely, the anti-miscegenation statute at issue in *Loving v. Virginia*, 388 U.S. 1 (1967), which prohibited persons of different races from marrying, and the statute at issue in *Zablocki v. Redhail*, 434 U.S. 374 (1978), which required non-custodial parents with child support obligations to obtain the court's permission to marry. *Montgomery*, 101 F.3d at 1124-25. The court then observed that anti-fraternization and anti-nepotism policies, on the other hand, do not place a "direct and substantial" burden on marriage, but rather "place a non-oppressive burden on the decision to marry" by making some potential partners less appealing than others, and thus such policies are analyzed under a rational basis standard. *Id.* at 1125-26 (collecting cases that apply rational basis test in reviewing anti-fraternization and anti-nepotism policies).

The STPSO's anti-fraternization policy does not place a "direct and substantial" burden on the right to intimate relationships because it does not completely prohibit one class of people from being with another. Instead, it affects that right only incidentally by requiring STPSO employees to relinquish their jobs if they choose to violate the policy. *See*, *e.g.*, *Bautista v. Cty. of Los Angeles*, 190 Cal. App. 4th 869, 877-78 (2010) (anti-fraternization policy prohibiting peace officer's relationship with persons under criminal investigation or indictment or having reputation for criminal activity upheld under rational basis test). The policy has no more than an incidental or minimal residual impact on the right to intimate association because it does not prohibit the relationship itself. Thus, this Court will analyze the rule under the rational basis test,

as have other courts reviewing such policies.

While "public employees do not surrender all their First Amendment rights by reason of their employment, … [w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 417-18 (2006). The question is not whether the governmental entity can establish a genuine public need for the regulation at issue, but whether the public employee attacking the regulation can demonstrate that there is no rational connection between the regulation and the promotion of safety of persons and property. *Kelly v. Johnson*, 425 U.S. 238, 247 (1976). "[A]nti-fraternization rules prohibiting police officers from socializing with those who they know are engaging in criminal conduct have routinely been upheld against constitutional challenges …." *Bautista*, 190 Cal. App. 4th at 878.

Under the deferential rational basis test, "[t]he question is only whether a rational relationship exists between the [government action] and a conceivable legitimate objective." *Simi Inv. Co. v. Harris Cty.*, 236 F.3d 240, 249 (5th Cir. 2000). If the question is at least debatable, there is no violation. Lewis contends that the STPSO has not identified a legitimate objective for its anti-fraternization policy. However, the STPSO has a legitimate interest in regulating the behavior of its employees, especially its most senior officers like Lewis, to minimize the risk for potential conflicts of interest posed by any association with persons of notoriety and to protect the credibility and integrity of the office. The STPSO's legitimate interests in preventing its officers from placing themselves in compromising positions and in preserving the STPSO's reputation in the public and in the law enforcement community are reasonably advanced by the anti-fraternization policy and therefore are sufficient to uphold the policy under the rational basis test. *See Keeney v. Heath*, 57 F.3d 579, 580 (7th Cir. 1995) (upholding anti-fraternization prison regulation under rational basis review; while regulation made it more costly for prison guard to marry prisoner, "the cost being the loss of her job, or

more precisely the loss of whatever margin made it a better job for her than any other that she could get," it did not forbid her from marrying); *Parks v. City of Warner Robins*, 43 F.3d 609, 614 (11th Cir. 1995) (anti-fraternization policy does not infringe right to intimate association where it "does not 'order' individuals not to marry"); *Poirier v. Mass. Dep't of Correction*, 532 F. Supp. 2d 275, 280-81 (D. Mass. 2008) (Department of Correction's rule prohibiting fraternization with inmates advanced department's "interest in assuring the integrity and objectivity of its correction officers in the discharge of their official duties," rejecting need to apply strict scrutiny analysis), *aff'd*, 558 F.3d 92, 96 (1st Cir. 2009) (upholding rule under either rational basis review or intermediate scrutiny); *Wolford v. Angelone*, 38 F. Supp. 2d 452, 461-62 (W.D. Va. 1999) (Department of Corrections' anti-fraternization policy, which prohibited prison guard from retaining job if she married convicted felon, upheld under rational basis review; rule was passed "to regulate work place relations and not marital relations").  Accordingly, Lewis has failed to state a claim for violation of his alleged right of association.

### 2.      Procedural Due Process Under the Fifth Amendment

Lewis alleges that Sheriff Smith violated his Fifth Amendment right to due process by selectively enforcing the anti-fraternization policy.   "The Fifth Amendment applies only to violations of constitutional rights by the United States or a federal actor."  *Jones v. City of Jackson,* 203 F.3d 875, 880 (5th Cir. 2000) (citing *Morin v. Caire*, 77 F.3d 116, 120 (5th Cir. 1996)).   Lewis has not alleged that Sheriff Smith acted under authority of the federal government.  Thus, Lewis has not stated a claim against Sheriff Smith for violations of his rights secured by the Fifth Amendment.

### 3.      Procedural Due Process under the Fourteenth Amendment

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  To state a procedural due process claim, a plaintiff must allege that: "(1) he has a property interest in his employment

sufficient to entitle him to due process protection, and (2) he was terminated without receiving the due process protections to which he was entitled." *Ristow v. Hansen*, 719 F. App'x 359, 364-65 (5th Cir. 2018) (quotations and brackets omitted). Whether a plaintiff has a property interest in his employment that entitles him to due process is governed by state law and exists only when he has a legitimate right to continued employment. *Id.* (citations omitted).

Although Lewis alleges that he was entitled to "due process," he does not allege that he had a legitimate right to continued employment under Louisiana law. In Louisiana, a public employee is generally considered an at-will employee and thus has no legitimate entitlement to continued employment in the absence of a contractual or statutory term providing otherwise. *See, e.g., Tucker v. Trustmark Ins. Co.*, 2016 WL 6563424, at *5 (E.D. La. Nov. 4, 2016) (citing *Quebedeaux v. Dow Chem. Co.*, 820 So. 2d 542, 545-46 (La. 2002)). Lewis points to no contractual or statutory term providing otherwise. Therefore, Lewis has not stated a Fourteenth Amendment procedural due process claim.

### 4.     Equal Protection Under the Fourteenth Amendment

"The Equal Protection Clause of the Fourteenth Amendment is 'essentially a direction that all persons similarly situated should be treated alike.'" *Wood v. Collier*, 836 F.3d 534, 538 (5th Cir. 2016) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "To establish a Fourteenth Amendment equal protection claim, [a plaintiff] 'must allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.'" *Williams v. Bedison*, 729 F. App'x 350, 351 (5th Cir. 2018) (quoting *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001)).

Lewis alleges that Smith violated the Equal Protection Clause by selectively enforcing the anti-fraternization policy against him due to his race when there are other STPSO employees

who are engaged in relationships or associations that violate the policy.[33]   Lewis has not satisfactorily alleged that any other STPSO employees were "similarly situated" to him.  He has not stated their ranks or positions with the STPSO, nor has he stated their races or the types of relationships and associations in which they are allegedly involved.  Thus, because there is no information from which to glean whether these other employees are similarly situated to Lewis, he has not stated an equal protection claim.  *See L&F Homes & Dev., L.L.C. v. City of Gulfport*, 538 F. App'x 395, 403 (5th Cir. 2013) (noting lack of comparator in selective-enforcement claim).

### 5.    Overbroad

In the First Amendment context, the Supreme Court "recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 449 n.6 (2008)).   Lewis's allegations regarding the overbreadth of the anti-fraternization policy are as follows:

28.

In addition to the unconstitutionality of Defendant's policies as applied to Plaintiff, Defendant's policies are also overbroad and vague.

29.

Pursuant to the Due Process Clause of the Fourteenth Amendment, a law or regulation must be drafted with sufficient clarity so as to give persons of ordinary intelligence a reasonable opportunity to know what is proscribed and to provide explicit standards for those who apply the law or regulation.

---

[33] R. Doc. 1 at 9-10.   Lewis states that the claim arises under the Due Process Clause of the Fifth Amendment.  The claim actually arises under the Equal Protection Clause of the Fourteenth Amendment and the Court will analyze it as such.

The Due Process Clause also requires that a law or regulation cannot be so overbroad as to sweep within its prohibitions constitutionally protected conduct.

31.

A law or regulation that is so overbroad that it would chill constitutional conduct is unconstitutional on its face.[34]

These allegations are nothing more than formulaic legal conclusions. Lewis's complaint is devoid of any facts from which one could find that "a substantial number of [the anti-fraternization policy's] applications are unconstitutional, judged in relation to the [policy's] plainly legitimate sweep." Moreover, as Lewis himself recognizes,[35] "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003). In any event, Lewis wholly fails to explain how the policy is overbroad in his view. Therefore, Lewis has not stated a claim that the anti-fraternization policy is overbroad under the First Amendment.

**6.      Vagueness**

In *Walker v. Savers*, the Fifth Circuit explained:

In general, an enactment is void for vagueness if its prohibitions are not clearly defined. Such enactments fail to provide fair warning to the innocent. Because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. For this reason, laws must provide explicit standards for those who apply them. …

… In a facial challenge to the vagueness of a law, our first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. Accordingly, a law that does not implicate constitutionally protected conduct should be upheld only if it is impermissibly vague in all possible applications. In contrast, a law that inhibits the exercise of constitutionally protected rights should only be upheld if it survives a more stringent test, because the degree of vagueness that the Constitution tolerates – as well as the relative

---

[34] R. Doc. 1 at 7.
[35] R. Doc. 8 at 15.

> importance of fair notice and fair enforcement – depends in part on the nature of the enactment. In addition, such a challenge is appropriate only on an allegation that the law is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.

*Walker v. Savers*, 658 F. App'x 720, 729-30 (5th Cir. 2016) (quotations, citations, and brackets omitted).

In his complaint, Lewis alleges that the anti-fraternization policy is vague because several terms, including "personal relationship," "close relationship," "association," "known felon," "work release person," "incarcerated individual," or "any person held in custodial confinement by arrest or imprisonment," are not adequately defined.[36] Lewis also alleges that the policy is vague because it does not explain when Sheriff Smith or his designee will grant "express written permission" to engage in one of the prohibited relationships.[37] Lewis' void-for-vagueness claim is a facial challenge to the policy; he does not challenge the policy as applied to him.

A statute or policy "is unconstitutionally vague if it does not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Rowell v. Pettijohn*, 816 F.3d 73, 83 (5th Cir. 2016) (quotations omitted). "In a civil action, a law is void for vagueness only if it 'commands compliance in terms so vague and indefinite as really to be no rule or standard at all' or if it is 'substantially incomprehensible.'" *Glass v. Paxton*, 2016 WL 8904948, at *3 (W.D. Tex. Aug. 22, 2016) (quoting *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 507 (5th Cir. 2001)). In examining the text of a challenged statute or policy, "words are given their ordinary meaning unless defined in the statute [or, here, policy]." *Rowell*, 816 F.3d at 84.

Under STPSO's anti-fraternization policy, employees of the STPSO are prohibited from entering "romantic or intimate personal or other close relationships" with "a known felon, Transitional Work Program inmate, or any incarcerated individual," and STPSO deputies are

---

[36] R. Doc. 1 at 8.
[37] *Id.*

prohibited from undertaking "a personal relationship or association, with or without a sexual relationship, … with a known felon, Work Release person, … any incarcerated individual," and "any person held in custodial confinement by arrest or imprisonment" except with "the express written permission of the Sheriff."  When these words are given their ordinary meaning and read in context of the policy as a whole, *see* La. Civ. Code arts. 9-13 (addressing interpretation of laws), the policy is readily understood and hardly incomprehensible.

By reading the anti-fraternization policy to mean what it states, STSPO employees are barred from "personal" and "close" relationships of the "romantic" and "intimate" variety expressly forbidden and as to which Lewis does not claim vagueness.  Under the contextual canon *ejusdem generis*, the general terms "personal" and "close" are interpreted by reference to the more specific descriptors (*i.e.*, "romantic" and "intimate") preceding them.  And since the policy later expands the "fraternization" barred to *deputies* to include "personal relationships or associations, with or without a sexual relationship," it is implied that the "personal" and "close" relationships barred to STSPO *employees* involve a sexual component.  Of the persons with whom STSPO employees are not to have these relations, Lewis complains that only the terms "known felon" and "incarcerated individual" are vague.  However, a person of ordinary intelligence can readily understand these commonly used words to forbid relationships with persons known to them to be felons or jailed.

STSPO deputies – a narrower category than STSPO employees – are barred from a slightly broader range of "personal relationships" and "personal associations," which may or may not involve sexual relationships, but are nevertheless "personal" as opposed to professional or work-related.  And the persons with whom deputies are barred from relating or associating include those described by terms – "known felon," "Work Release person," "incarcerated individual," and "any person held in custodial confinement by arrest or imprisonment" – whose generally prevailing or technical meanings would be apparent to persons employed as deputies.

It would be hard to imagine how a person of ordinary intelligence, much less an STSPO deputy of ordinary intelligence, could not understand these terms to provide fair notice of the kinds of persons with whom the policy forbids such relationships.

Nor has Lewis explained how the policy was or could be applied to him or any similarly-situated STSPO employee in a discriminatory or other improper way as a result of any alleged vagueness. Accordingly, Lewis has not stated a claim that the STPSO's anti-fraternization policy is void for vagueness, either as applied to him or on its face.

### C. Lewis's Official Capacity Claims against Sheriff Smith

Had Lewis stated claims that the anti-fraternization policy either infringed the right of association or was void for vagueness, such claims against Sheriff Smith in his official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell*, 436 U.S. at 690 n.55. To succeed on a *Monell* claim, the plaintiff must establish: (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. *Valle v. City of Hous.*, 613 F.3d 536, 541-42 (5th Cir. 2010).

The "policymaker" prong is satisfied if actual or constructive knowledge of a policy is attributable to the municipality's governing body or to an official to whom the municipality has delegated policy making authority. *Webster v. City of Hous.*, 735 F.2d 838, 842 (5th Cir. 1984). Under Louisiana law, the sheriff is the final policymaker for a parish's law enforcement. *See* La. Const. art. 5, § 27 ("[The sheriff] shall be the chief law enforcement officer in the Parish."). Sheriff Smith is the policymaker for the STPSO.

The "official policy" prong requires that the deprivation of constitutional rights be inflicted pursuant to an official custom or policy. "Official policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations." *Piotrowski v. City of Hous.*, 237 F.3d 567, 579 (5th Cir. 2001). The STPSO's anti-fraternization policy is an official policy of the

department, and Lewis alleges that it is the moving force behind the alleged constitutional violations. Therefore, assuming Lewis' claims of constitutional violation had legs, Lewis would have stated claims against Sheriff Smith in his official capacity.

### D. Lewis's Individual Capacity Claims against Sheriff Smith

Personal-capacity claims are brought against a government official as an individual. "[P]laintiffs suing governmental officials in their individual capacities must allege specific conduct giving rise to a constitutional violation." *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999). Further, the defendant sued in his individual capacity must be "either personally involved in the constitutional violation or [one] whose acts are causally connected to the constitutional violation alleged." *Id.*

Lewis alleges that Sheriff Smith promulgated the policy and terminated his employment for violating it.[38] Sheriff Smith argues that he is entitled to qualified immunity on Lewis's individual capacity claims against him.[39]

Qualified immunity protects a government official from liability for civil damages if his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Charlot v. City of Hous.*, 757 F. App'x 310, 312 (5th Cir. 2018) (quotation omitted). The doctrine allows government officials "to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 313 (quotation omitted). The Fifth Circuit has explained the purpose of the doctrine of qualified immunity this way: "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity

---

[38] R. Doc. 1 at 4-7.
[39] R. Doc. 6-2 at 24-23.

involves not only immunity from liability, but also immunity from suit.

In evaluating a claim of qualified immunity, courts consider: "(1) whether an officer's conduct violated a federal right and (2) whether this right was clearly established." *Charlot*, 757 F. App'x at 313 (quotation omitted). "A right is clearly established when controlling authority – or a robust consensus of persuasive authority – [defines] the contours of the right in question with a high degree of particularity." *Id.* (quotation omitted). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015). It is not required that there be "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "Clearly established" means "settled law." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). Mere implication from precedent does not suffice. *Id.* at 590. As the Fifth Circuit instructs:

> "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, U.S. 335, 341 (1986)). In sum, [qualified immunity] "represents the norm, and courts should deny a defendant immunity only in rare circumstances." *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (internal quotation marks and citations omitted). "It is the plaintiff's burden to find a case in his favor that does not define the law at a high level of generality." *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (per curiam) (internal quotation marks and citation omitted).

*Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019). The central concern is that the official has fair warning. *Delaughter v. Woodall*, 909 F.3d 130, 140 (5th Cir. 2018).

Given the Court's analysis and disposition of Lewis' claims of constitutional violation, including infringement of his right of association and vagueness of the anti-fraternization policy, it is not necessary to address whether Sheriff Smith is entitled to qualified immunity. However, in an abundance of caution, the Court will do so, especially since the issue is so easily resolved. With respect to whether his own intimate relationship with Doe falls within the ambit of

protection afforded by the right of association, Lewis has pointed the Court to no decision on point or precedent placing the constitutional question beyond doubt, instead admitting that "the Fifth Circuit does not appear to have definitively ruled on the issue."[40]  Nor has Lewis identified a case holding that an anti-fraternization policy like STSPO's breached a right of association under the rational basis test.  And Lewis has not cited a case finding any of the policy's specific terms to which he objects to be void for vagueness or even ambiguous under some other constitutional doctrine.  Moreover, the Court has determined, under the circumstances of this case, that even if Lewis' relationship with Doe was constitutionally protected, STPSO's anti-fraternization policy does not transgress that right on rational basis review, and that the policy is not void for vagueness.  Therefore, it cannot be said that Lewis' right to be free of the violations of which he complains is clearly established.  Hence, even if Lewis had stated claims of constitutional violation, Sheriff Smith is entitled to qualified immunity as to such claims.

IV.    **CONCLUSION**

Accordingly, for the foregoing reasons,

IT IS ORDERED that Sheriff Smith's motion to dismiss (R. Doc. 6) is GRANTED and Lewis's claims are dismissed with prejudice.


New Orleans, Louisiana, this 2nd day of August, 2019.


_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE

---

[40] R. Doc. 8 at 15.